UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| MARTHA ZOE MOORE, CHARLES DANE MOORE & MELISSA MOORE HUTCHINSON | CIVIL ACTION NO. 3:14CV913 |
| VERSUS | JUDGE ROBERT G. JAMES |
| DENBURY ONSHORE, LLC | MAG. JUDGE KAREN L. HAYES |

RULING

This is an oilfield remediation case. Plaintiffs Martha Zoe Moore, Charles Dane Moore, and Melissa Moore Hutchinson ("the Moores") filed suit against Denbury Onshore, LLC ("Denbury") for contaminating their property through oil and gas operations. Because this suit involves environmental damage arising from oil and gas activities, LA. REV. STAT. § 30:29 ("Act 312") applies.

The Moores seek, among other things, remediation of their property to its original condition. Denbury has filed a Motion for Partial Summary Judgment [Doc. No. 31] moving the Court to (1) dismiss the Moores' claim for remediation to original condition and (2) find that Denbury's only obligation is to fund the most feasible remediation plan under Act 312. For the following reasons, Denbury's motion is GRANTED IN PART and DENIED IN PART.

I.      FACTS AND PROCEDURAL HISTORY

The Moores own the property at issue in this case which consists of approximately 626 acres in Richland Parish, Louisiana, near the town of Delhi. Denbury conducts oil and gas operations on the property. The Moores and their predecessors had executed two leases giving Denbury and their

predecessors the right to, among other things, lay pipe on their land.[1] In 2011, the Moores also executed an easement and damage release ("damage release"). In the damage release, the Moores released claims for future damages, "temporary or permanent," which may later become obvious "by virtue of all operations" conducted by Denbury. [2]

On March 26, 2013, a Denbury pipeline ruptured and deposited brine, oil, and other toxic substances on the Moores' property, causing damage to trees, vegetation, fish in ponds, and contamination of the water and soil.

---

[1]One lease was entered into in 1938. The other was entered into in 1941. Paragraph 1 of the 1941 lease grants the following rights:

> Lessor...hereby grants, leases and lets exclusively unto lessee for the purpose of investigating by any method known to the oil, gas and mining industry, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building tanks, power stations, telephone lines, and other structures thereon to produce, save, take care of, treat, transport, and own said products, and housing its employees...

[Doc. No. 31-5, 1941 Oil and Gas Lease, p. 4].

[2]The damage release states, in pertinent part:

> [Moore]...does hereby acknowledge full, complete, and entire settlement, satisfaction, payment and discharge of all damages and injuries of whatsoever nature and character and all claims therefore, whether asserted or not, of whatsoever kind or nature now obvious or ascertainable, or which may hereafter become obvious or ascertainable, temporary or permanent, by virtue of all operations, activities and conduct of Denbury Onshore...including but not limited to the right of [Denbury] to drill, produce wells, construct, use and maintain drill site locations to place, use and maintain tank batteries and other oil, gas, saltwater, water and CO2 facilities...for saltwater disposal purposes...and for any and all purposes needed by [Denbury] for its oil, gas, saltwater, water and CO2 operations on, in, under, across, from and to the easements described herein.

[Doc. No. 31-4, 2011 Damage Release and Easements, p. 5].

2

On March 26, 2014, the Moores filed a Petition in the Fifth Judicial District Court, Parish of Richland, State of Louisiana ("state court"). The Petition alleged that the Moores were entitled to have Denbury completely remediate the damages and contamination to the property and restore it to original condition.

On April 29, 2014, Denbury removed the case to this Court on the basis of diversity. [Doc. No. 1]. In early 2015, Denbury, in accordance with Act 312 procedures, admitted liability and moved the Court to refer this matter to the Louisiana Department for Natural Resources, Office of Conservation ("OC") to determine a feasible plan to remediate the Moores' property to a statutorily mandated standard. Both the Moores and Denbury submitted remediation plans.

The OC adopted Denbury's plan as the most feasible plan to address any continuing problems with soil on the site. The Moores' plan, which the OC rejected, seeks to restore the property to original condition at a cost in excess of $26 million dollars.

On November 6, 2015, Denbury filed the instant Motion for Partial Summary Judgment asking this Court to dismiss the Moores' claim for remediation to original condition and declare that remediation damages in this case are limited to funding the most feasible plan under Act 312. [Doc. No. 31]. The Moores filed a Memorandum in Opposition arguing that they were entitled to damages in addition to those needed to fund the most feasible plan. [Doc. No. 35]. They note that the Louisiana Supreme Court has expressly held additional remediation damages–damages that plaintiffs can pocket–are available in certain situations even in the absence of an express contractual provision. Denbury filed a reply noting that the legislature amended Act 312 in 2014–well after the Louisiana Supreme Court decided the cases on which the Moores rely. [Doc. No. 42].

II.     LAW AND ANALYSIS

    A.     **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).  In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.  However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Thus, Summary Judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

    B.     **Choice of Law**

Sitting in diversity, the Court must apply Louisiana substantive law and Louisiana procedural

4

law when it affects substantive rights.[3] *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).  In order to determine Louisiana law, this Court looks to the decisions of the Louisiana Supreme Court.  *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003).

Here, the Court is presented with an oilfield remediation suit, governed by Act 312. The Louisiana Legislature recently amended key portions of Act 312 relating to private damage claims. No Louisiana or federal court has addressed these provisions. Thus, when interpreting these provisions, the Court must make its best *Erie* guess as to how the Louisiana Supreme Court would address the issues. In order to accomplish this, the Court first examines the legislative and judicial history of Act 312.

## C.   Act 312 and the 2014 Amendments

### 1.   *Act 312 Generally*

A discussion of Act 312 begins with the 2003 case, *Corbello v. Iowa Prod.*, 2002-C-0826, (La. 2/25/03); 850 So.2d 686. In that case, the plaintiff alleged that the defendant's oil and gas operations had damaged his property. The parties had an oil and gas lease that compelled the lessee to "restore the premises as nearly as possible to their present condition." *Id*. at 694. The Court held that the defendant had an obligation to abide by the contract's terms despite remediation costs vastly exceeding the value of the property. Further, there was no requirement that a successful plaintiff in an oilfield remediation suit use the damage award to actually remediate the property. After *Corbello*, there was "a perception that contaminated property was the equivalent of a winning lottery ticket for

---

[3]Although the Louisiana Supreme Court has described Act 312 as procedural, federal courts have noted that Act 312 applies in federal court because it affects substantive rights. *See Brownell Land Co. v. Oxy USA, Inc*., 538 F.Supp.2d 954, 959 (E.D. La. 2007) (observing that federal courts apply the procedural aspects of the Louisiana Malpractice Act and questioning why Act 312 would compel a different result).

the landowner." Loulan Pitre, Jr., "*Legacy Litigation" and Act 312 of 2006*, 20 TUL. ENVTL. L.J., 347, 348 (2007).

Recognizing that harm to the public interest could result from plaintiffs not using damage awards to restore contaminated property, the Louisiana Legislature acted. The Legislature passed Act 312 primarily in an effort to ensure that contaminated oil and gas exploration sites were remediated to the extent necessary to protect the public interest.  The Act applies whenever a "private suit is filed which involves environmental damage subject to the jurisdiction of the La. DNR."  LA. REV. STAT. § 30:29(A).

Act 312 contains a number of unique features. First, it applies in any action where a judicial demand is made arising from or alleging environmental damage. *Id*. at § (B)(1). Second, Act 312 allows "the department or the attorney general" to intervene in litigation involving environmental damage. *Id*. at § (B)(2). Third, Act 312 allows a defendant to make a "limited admission" of liability and have the case referred to the OC before the remediation claims are tried by the trier of fact (as Denbury did in this case). *Id*. at § (C)(1). After this referral, the OC will hold a public hearing and promulgate the most feasible plan to remediate the property to state regulatory standards. *Id*. at § (C)(2)(a).  Once the OC has prepared its plan and filed it with the district court, the OC-approved plan is entitled to a rebuttable presumption that it is the most feasible plan to evaluate or remediate the property to applicable state regulatory standards.  *Id*. at § (C)(2)©.  Finally, under Act 312, all damages awarded in connection with remediation, unless the statute provides otherwise, must be deposited into the registry of the court to be used to remediate the property to state regulatory standards. *Id*. at § (D)(1).  The remediation damages that escape deposit into the court registry are damages that the plaintiff can keep.

     **2.**     *Damages Under Act 312 Before the 2014 Amendments.*

As originally written, Act 312, Subsection D, mandated that all damages awarded in connection with the statute, except those described in Subsection H, must be deposited into the registry of the court and used to remediate the property. Before the 2014 Amendments, Subsection H provided:

> This section shall not preclude an owner of land from pursuing a judicial remedy for private claims suffered as a result of environmental damage, except as otherwise provided in this section. Nor shall it preclude a judgment ordering damages for or implantation of additional remediation costs in excess of the requirements of the plan adopted by the court pursuant to this Section as may be required in accordance with the terms of an express contractual provision. Any award granted in connection with the judgment for additional remediation is not required to be paid into the registry of the court. This subsection shall not be interpreted to create any cause of action or to impose additional implied obligations under the mineral code or arising out of a mineral lease.

§ (H) (amended 2014).

Thus, the question, originally, was whether or not Subsection D capped remediation damages at those required to fund the most feasible plan in the absence of an express contractual provision providing for a higher level of remediation.

In 2010, the Louisiana Supreme Court decided *Marin v. Exxon*, 2009-C-2368, 2009-C-2371, (La. 10/19/10); 48 So.3d 234. The plaintiffs argued that the compensatory awards should have been based on the amount necessary to restore the land to its original condition–despite there being no express contractual provision–rather than the amount needed to restore the land to state regulatory standards. *Id.* at 257. This argument was based on the trial court's finding that the lessee had acted unreasonably and excessively in causing subsurface contamination. *Id*.

The Supreme Court held that, in situations where the lessee acts unreasonably or excessively,

the lessee has an obligation to correct the damage; but under the facts of that case, correction of the

damage to state regulatory standards was satisfactory:

> In our view, the duty to remediate oilfield contamination exists under the prudent operator standard of the Mineral Code by virtue of our holding in *Castex*, and it certainly exists under the Civil Code. The holding in *Castex* merely recognized that in the absence of unreasonableness or excessiveness, the lessee has the duty to restore the surface minus normal wear and tear. Where the lessee has operated unreasonably or excessively, as in this case, the lessee has additional obligations, e.g., the obligation to correct the damage due to the unreasonable or excessive operations. However, that does not necessarily mean that the lessee has a duty to restore the land to its pre-lease condition, particularly where, unlike dredged canals, subsurface contamination is not overt and cannot be considered "wear and tear." *Castex* explained that in determining what constitutes necessary "wear and tear" in a particular case, "it is useful to consider the character of the specific rights granted under the lease" to consider whether the lessor consented to particular activities. The damage caused by [the defendant's] unreasonable operations was the contamination of the soil, and it is clear plaintiffs did not consent to this contamination. Therefore, [the defendant's] additional restoration duty is the duty to correct the contamination. The lower courts both correctly recognized this point and held that remediation to 29B standards satisfied the *Castex* requirements.

48 So.3d at 259-60.

Finally, in 2013, the Louisiana Supreme Court decided *State v. La. Land and Explor. Co.*

2012-0884, (La. 1/30/13); 110 So.3d 1038 ("*LL&E*"), and squarely addressed the damages available

under Act 312. In that case, the trial court granted summary judgment to the defendants based on

their argument that Subsection D caps damages at those needed to satisfy state regulatory standards

in the absence of a contrary contractual provision. *Id.* at 6. The Louisiana Supreme Court disagreed.

The Louisiana Supreme Court held that Subsection D must be read in connection with Subsection

H which expressly allowed for remediation damages in excess of those needed to satisfy state

regulatory standards–even in the absence of a contractual provision:

> In Subsection H, the legislature specifically makes clear the statute was not

intended to change the substantive law. Subsection H states that the procedure enacted by this Section shall not preclude a landowner from pursuing a judicial remedy or receiving a judicial award for private claims, other than those remediation damages necessary to fund the most feasible plan to remediate the land to standards that protect the public interest...If a court awards remediation damages pursuant to an express contract provision that is a greater amount than that ordered to be placed in the court's registry to fund the remediation plan, then the landowner is entitled to those "excess" remediation damages. Likewise "any award" for "additional remediation" may be kept by the landowner as well. If the money judgment for remediation exceeds the amount necessary to fund the plan, the plaintiff is granted a personal judgment on his other non-remediation private claims (if he prevailed on such claims at trial). All of these determinations are made part of a single judgment, and any party aggrieved by any aspect of this single judgment may appeal. The court of appeal correctly determined "[t]he clear language of the statute contemplates the landowner receiving an award in addition to that provided by the feasible plan." The legislature states that the procedure it enacts in this legislation should not be interpreted as creating any cause of action or to impose additional implied obligations under the Mineral Code or arising out of a mineral lease that is not already there. As previously discussed, this procedural statute does nothing to the substantive rights of the landowner, whether arising out of (1) the implied obligations of the mineral lease under the Civil Code or (2) the implied obligation arising out of La. R.S. 3:122 if the landowner can show a mineral lessee has acted unreasonably or excessively under the lease.

110 So.3d at 1054.

These cases  affirmed that Act 312 allowed damages in excess of those needed to remediate the property to state regulatory standards, even in the absence of a contractual provision. A plaintiff could keep these damages; there was no requirement that they be deposited into the court registry.

### 3.    The 2014 Amendments

In 2014, the legislature amended the private damage provisions of Act 312. Subsection H now reads:

(1)    This Section shall not preclude an owner of land from pursuing a judicial remedy or receiving a judicial award for private claims suffered as a result of environmental damage, except as otherwise provided in this Section. Any award granted in connection with the judgment for additional remediation in excess of the requirements of the feasible plan adopted by the court is not required

9

to be paid into the registry of the court.

> (2)   Damages that may be awarded in an action under this Section shall be governed by the provisions of Subsection M of this Section. This Section shall not be interpreted to create any cause of action or to impose additional implied obligations under the mineral code or arising out of a mineral lease.

§ (H)(1)(2) (emphasis added).

Subsection M, which defines the damages available under Subsection H, provides:

> (1)   In an action governed by the provisions of this section, damages may be awarded only for the following:
>
> > (a)   The cost of funding the feasible plan adopted by the court.
> >
> > (b)   The cost of *additional remediation* **only if required by an express contractual provision providing for remediation to original condition or to some other specific remediation standard.**
> >
> > ©   The cost of evaluating, correcting or repairing environmental damage upon a showing that such damage was caused by unreasonable or excessive operations based on rules, regulations, lease terms and implied lease obligations arising by operation of law, or standards applicable at the time of the activity complained of, provided that such damage is not duplicative of damages awarded under Paragraphs (1) and (2) of this section.
> >
> > (d)   The cost of nonremediation damages.

§ (M)(1)(a-d) (emphasis added).

Initially, it is important to consider Denbury's argument that the 2014 Amendments limit the damages a plaintiff can directly recover (without having to deposit into the Court's registry) to "additional remediation" damages under Subsection M(b).

### D.   Effect of the 2014 Amendments on the Availability of Direct Remediation Damages.

Denbury argues that the 2014 Amendments limit a plaintiff's direct damages for remediation to those available under Subsection M(b) for "additional remediation" when required by an express

contractual provision; because the damage release and leases affecting the Moores' property do not contain an express contractual provision, the Moores' damages are limited to those necessary to fund the most feasible plan which must be deposited into the court's registry. In reaching that conclusion, Denbury makes three observations about Act 312's language.

First, Subsection D provides that: "whether or not the department or the attorney general intervenes, and except as provided in Subsection H of this Section, all damages or payments in any civil action, including interest thereon, awarded for the evaluation or remediation of environmental damage shall be paid exclusively into the registry of the court in an interest-bearing account with the interest accruing to the account for clean-up." LA. REV. STAT. § 30:29 (D)(1).

Second, Subsection H mandates that all damages except those for "additional remediation in excess of the requirements of the feasible plan," be deposited into the court registry. *Id*. at § (H)(1). It then refers the reader to Subsection M, which further defines and explains the available damages. *Id.* at § (H)(2).

Third , Denbury notes that only Subsection M(b) uses the term "additional remediation," and that provision only allows for such damages if an express contractual provision provides for them. *Id*. at § (M)(b).

On the other hand, the Moores argue that Subsection M©, which allows recovery of "the cost of evaluating, correcting, or repairing environmental damage" if unreasonable or excessive operations caused the damage, allows them to directly recover damages on top of those needed to fund the most feasible plan. In support of their argument, they note that the Louisiana Supreme Court in *LL&E* expressly held that victorious plaintiffs could recover those damages in addition to the damages needed to fund the most feasible plan. But the *LL & E* case predates the 2014 Amendments

and is not very helpful to the Court.

The Court agrees with Denbury. Because jurisdiction is premised on diversity of citizenship in this case, Louisiana rules of statutory interpretation apply. Under Louisiana law, the ultimate goal of statutory interpretation is to discern the Legislature's intent. The Louisiana Supreme Court has consistently described the proper technique for interpreting Louisiana statutes:

> [T]he function of statutory interpretation and the construction given to legislative acts rests with the judicial branch of government. The rules of statutory construction are designed to ascertain and enforce the intent of the Legislature. Legislation is the solemn expression of legislative will and, thus, the interpretation of legislation is primarily the search for the legislative intent. We have often noted the paramount consideration in statutory interpretation is ascertainment of the legislative intent and the reason or reasons which prompted the Legislature to enact the law.
>
> The starting point in the interpretation of any statute is the language of the statute itself. When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in the search of the intent of the legislature. However, when the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law. Moreover, when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole.

*M.J. Farms, Ltd. v. Exxon Mobil Corp.*, 2007-2371, (La. 7/1/08); 998 So.2d 16, 26-27. (citations omitted).

Applying these principles leads the Court to the conclusion that, after the 2014 Amendments, a plaintiff cannot *directly* recover additional remediation damages in the absence of an express contractual provision. The Legislature's use of the words "additional remediation" in Subsection H and Subsection M(b), but not Subsection M©, is presumed to be deliberate. *See Hall v. Brookshire Bros., Ltd.*, 2002-2404, (La. 6/27/03); 848 So.2d 559, 571 (noting different language employed in two provisions is presumed to be a deliberate legislative choice). If it intended a different result, the

12

Legislature could have easily placed "additional remediation" in Subsection M© in connection with unreasonable or excessive operations. It did not. This Court must give effect to the words the Legislature used.

Moreover, this interpretation squares with the Act's language as a whole. For example, Subsection A states:"[t]he provisions of this section shall not be construed to impede or limit **provisions under private contracts** imposing remediation obligations in excess of the requirements of the department or limit the right of a party to a private contract to enforce any contract provision in a court of proper jurisdiction." *Id.* at § (A) (emphasis added). The interpretation Denbury urges, and that the Court adopts, does nothing to impede additional remediation under private contracts.[4]

Next, Subsection D requires all remediation damages, except those explicitly stated in Subsection H, to be deposited into the court's registry.

> D. (1) Whether or not the department or the attorney general intervenes, and except as provided in Subsection H of this section, all damages or payments in any civil action, including interest thereon, awarded for the evaluation or remediation of environmental damage shall be paid exclusively into the registry of the court in an interest-bearing account with the interest accruing for the account for clean up.

Subsection H then provides that only "additional remediation" in excess of the most feasible plan need not be deposited into the Court's registry. Finally, Subsection M, which lists the types of damages available under Subsection H, uses the term "additional remediation" only in Subsection M(b). *Id.* at § (M)(b). "Additional remediation," is deliberately absent from Subsection M©. *Id.* at § (M)©.

---

[4]Noticeably absent from Subsection A is any command that the provisions be construed to preserve a plaintiff's ability to directly recover costs for unnecessary or excessive operations in the absence of an express contractual provision.

Finally, the Court recognizes that the Legislature amended this act immediately after the Supreme Court's decision in *LL&E*. Had the Legislature desired the status quo, it would not have needed to alter the legislation. Indeed, a canon of Louisiana statutory interpretation instructs courts to presume a change in the law when the legislature changes the statute's language. *Causeway Medical Suite v. Ieyoub*, 109 F.3d 1096, 1109 (5th  Cir. 1997) (citing *New Orleans Rosenbush Claims Serv., Inc. v. City of New Orleans*, 653 So.2d 538, 544 (La. 1995). Thus, the 2014 Amendments limit direct damages (those that need not be deposited into the Court's registry) to those described in Subsection M(b) for "additional remediation" when a contractual provision compels that result.

The next issue for this Court then, is whether any express contractual provision providing for remediation to original condition or to some other specific remediation standard applies in this case.

**E.        Subsection M(b)'s Availability in the Instant Case**.

In their Petition, the Moores asked for remediation in excess of the state regulatory standard. Specifically, they asked for remediation of their property to "original condition." [Doc. No. 1-2, Petition]. The thrust of their argument is that Denbury was grossly negligent or somehow acted unreasonably or excessively, allowing recovery under Subsection M©. However, the only way for the Moores to obtain "additional remediation" to "original condition" after the 2014 Amendments is through an express contractual provision.

No such provision exists in this case. The Moores' property is subject to a damage release as well as two leases, but none of these contracts provide for "remediation to original condition or to some other specific remediation standard." LA. REV. STAT. § 30:29 (M)(b).

Accordingly, Denbury's motion is GRANTED to the extent it asks the Court to dismiss the Moores' claim for remediation to original condition.

### F.    The Applicability of M© in this Action.

Denbury's Motion for Partial Summary Judgment also asks for a finding that its liability be limited to funding the feasible plan. But, just because the Moores may not directly recover excess or additional remediation damages in this case does not mean Denbury's liability ends with funding the most feasible plan. Subsection M© allows recovery of certain costs needed to repair environmental damage as a result of a party's unreasonable or excessive operations. In determining whether operations were unreasonable or excessive, the Court should look to applicable rules, regulations, and lease contracts and terms. Finally, the damages awarded must be deposited into the Court's registry to fund the remediation effort.

To the extent Denbury asks the Court to find that these damages are not available at all–that is, Denbury cannot even be made to pay them into the Court's registry, the Court will DENY the motion.

Denbury's argument against damages under Subsection M© is that its operations were reasonable and not excessive in light of the contracts the parties and their predecessors had entered into. It notes that the damage release granted broad relief from liability for even permanent damage. In response, the Moores respond that issues of unreasonableness and contractual intent are more properly addressed by the fact finder during trial. They point to *LL&E* to support their argument. In that case, the Louisiana Supreme Court affirmed the Third Circuit's reversal of a trial court summary judgment grant. The trial court had granted summary judgment based on a theory that Act 312 capped a plaintiff's remediation damages at those needed to fund the most feasible plan. The Court

overruled this holding. It also observed that claims for damages based on unreasonable or excessive lease operations were appropriately resolved during a trial on the merits:

> [T]he finder of fact in this case will have to make several determinations in resolving the plaintiffs' contract and tort claims. Only after all of plaintiffs' claims have been heard, and a finding is made the plaintiffs are entitled to remediation of the property, will the procedure mandated in La. R.S. 30:29 come into play, as described, supra.

*La. Land and Explor.* 110 So.3d at 1059. *See also, Marin* 48 So.3d 234 at 260 (finding, *after a trial on the merits*, that unreasonable or excessive operations imposed a duty on the lessee to correct the damage).

The same logic applies in this case. The Louisiana precedent on this issue leads the Court to conclude that Denbury's unreasonableness or excessiveness is not properly determined at this stage in the litigation. Rather, these issues are better resolved at a trial on the merits.

In line with *Marin* and *LL&E* it would be premature for this Court to conclude Denbury has no obligations other than to fund the most feasible plan. While Denbury does not have a duty to remediate to "original condition" under Subsection M(b), depending on the facts uncovered at trial, it may have a duty to repair damage caused as a result of its alleged unreasonableness or excessiveness. However, these damages would not go to the Moores directly; rather, Denbury would deposit them into the Court's registry.

## III. CONCLUSION

For these reasons, the Court GRANTS IN PART and DENIES IN PART Denbury's Motion for Partial Summary Judgment. To the extent Denbury moves the Court to dismiss the Moores' claim for remediation to original condition, the motion is GRANTED. However, to the extent Denbury moves the Court to find that its liability in this case is limited to funding the most feasible

16

plan, its motion is DENIED.

  MONROE, LOUISIANA, this 1st  day of February, 2016.


                   _____

                   **ROBERT G. JAMES**
                   **UNITED STATES DISTRICT JUDGE**