UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **MARTHA ZOE MOORE, CHARLES DANE MOORE & MELISSA MOORE HUTCHINSON** | **CIVIL ACTION NO. 3:14CV913** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **DENBURY ONSHORE, LLC** | **MAG. JUDGE KAREN L. HAYES** |

## RULING

This is an oilfield remediation case brought by Plaintiffs Martha Zoe Moore, Charles Dane Moore, and Melissa Moore Hutchinson ("the Moores") against Defendant Denbury Onshore, LLC ("Denbury"), pursuant to LA. REV. STAT. § 30:29 ("Act 312"). Pending before the Court is the Moores' Motion for Reconsideration [Doc. No. 60] of the Court's Ruling and Judgment on Denbury's Motion for Partial Summary Judgment. [Doc. Nos. 56, 57]. For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

**I.     RELEVANT FACTS AND PROCEDURAL HISTORY**

The underlying facts are discussed in the Court's Ruling on Denbury's Motion for Partial Summary Judgment. [Doc. No. 56]. That portion of the Ruling is incorporated herein. Essentially, the Moores allege that Denbury contaminated their property through oil and gas operations. The Moores now seek damages under Act 312. Act 312 provides a mechanism for ensuring contaminated property is remediated to state regulatory standards. Specifically, it compels liable defendants to fund the "most feasible plan" to return the property to state regulatory standards. Defendants deposit the money to fund the plan into the Court's registry to ensure it is actually used for remediation. In their Petition [Doc. No. 1], the Moores also ask for damages above those needed to fund the most feasible

plan.

Denbury filed a motion for partial summary judgment and asserted the following: (1) Denbury had no obligation to remediate the property to its original condition, and (2) Denbury's liability was limited to funding the most feasible plan. [Doc. No. 31].

The Court granted Denbury's motion in part and denied the motion in part. [Doc. Nos. 56, 57]. With respect to Denbury's claim that it was not obligated to remediate the Moores' property to original condition, the Court granted the motion. However, the Court denied the motion to the extent Denbury contended it had no remedial obligation besides funding the most feasible plan. The Court found a genuine issue of material fact as to whether Denbury operated unreasonably or excessively. Nevertheless, the Court found that Denbury would deposit damages awarded for unreasonable or excessive operations, if any, into the Court's registry.

Armed with legislative history and canon-based arguments, the Moores now move the Court to revisit its judgment and deny Denbury's motion in its entirety. [Doc. No. 60]. Denbury filed an opposition. [Doc. No. 72]. The matter is ripe.

II.     **LAW AND ANALYSIS**

    A.     **Standard of Review on Motions for Reconsideration**

The Federal Rules do not allow for a motion for reconsideration *in haec verba*. But the Fifth Circuit has "consistently recognized that such a motion may challenge a judgment or order under Federal Rules of Civil Procedure 54(b), 59(e), or 60(b)." *Southern Snow Mfg. Co., Inc. v. SnowWizard Holdings, Inc.*, 921 F.Supp.2d 548, 564 (E.D. La. 2013). " Rules 59 and 60, however, apply only to final judgments. An order on a motion for partial summary judgment is interlocutory and the trial court has discretion to reconsider or reverse its decision." *Id.* (citing *Lavespere v. Niagra*

*Mach & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990).

Here, the Court's original ruling and judgment addressed Denbury's motion for partial summary judgment. Accordingly, Rule 54(b) applies. Under Rule 54(b), the district court "possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *Stoffels ex rel. SBC Telephone Concession plan v. SBC Comm., Inc.*, 677 F.3d 720, 726 (5th Cir. 2012); *Melancon v. Texaco, Inc.*, 659 F.2d 551, 553 (5th Cir. 1981). "The exact standard applicable to the granting of a motion under Rule 54(b) is not clear, though it is typically held to be less exacting than would be a motion under Rule 59(e)." *Livingston Downs Racing Ass'n v. Jefferson Downs Corp.*, 259 F.Supp.2d 471, 474-75 (M.D. La. 2002). However, courts in this district "look to the kinds of consideration under [Rules 59 and 60] for guidance." *SGC Land, LLC v. La. Midstream Gas Serv.*, 939 F.Supp.2d 612, 624 (W.D. La. 2013). Under Rule 59(e), a motion to alter or amend a judgment may be granted: "(1) to correct manifest errors of law or fact upon which the judgment is based; (2) the availability of new evidence; (3) the need to prevent manifest injustice; or (4) an intervening change in controlling law." *In the Matter of Self*, 172 F.Supp.2d 813, 815-16 (W.D. La. 2001) (citing 11 WRIGHT, MILLER, & KANE, FEDERAL PRACTICE AND PROCEDURE § 2810.1). Finally, motions for reconsideration are not proper vehicles to recycle arguments that the parties have already made.

### B. Louisiana Principles of Statutory Interpretation

Sitting in diversity, the Court is bound by Louisiana rules of statutory construction. *Engines Southwest, Inc v. Kohler Co.*, 371 F.Supp.2d 830, 835 (W.D. La. 2005). Under Louisiana law, statutes are interpreted as follows:

> when a law is clear and unambiguous and its application does not lead to

> absurd consequences, it shall be applied as written, with no further inquiry made in search of the legislative intent. However, when a law is susceptible of different meanings, 'it must be interpreted as having the meaning that best conforms to the purpose of the law. The meaning and intent of a law is determined by considering the law in its entirety and all other laws concerning the same subject matter and construing the provision in a manner that is consistent with the express terms of the statute and with the obvious intent of the lawmaker in enacting it. The statute must therefore be applied and interpreted in a manner that is logical and consistent with the presumed fair purpose and intention the legislature had in enacting it. Courts should give effect to all parts of a statute and should not adopt a statutory construction that makes any part superfluous or meaningless, if that result can be avoided.

*Palmer v. La. Bd. of Elementary and Secondary Educ.*, No. 2002-C-2043 (La. 4/9/03); 842 So.2d 363, 367.

Louisiana courts routinely inspect relevant legislative history to resolve ambiguities in statutes. *See Detillier v. Kenner Reg. Med. Ctr.*, No. 2003-CC-3259 (La. 7/6/04); 877 So.2d 100, 106 (quoting *Lockett v. State, Dep't. of Transp. and Dev.*, 2003-1767 (La. 2/25/04), 869 So.2d 87) ("One particularly helpful guide in ascertaining the intent of the Legislature is the legislative history of the statute in question and related legislation.").

For example, "[c]ommentary at legislative committee meetings and journals of the houses of the state legislature are helpful to courts in determining the purpose and true legislative intent behind the law." *State Farm Mut. Auto. Ins. Co v. U.S. Agencies, L.L.C.*, 2005-0728 (La. App. 1 Cir. 3/24/06); 934 So.2d 745, 748; *see also Bridges v. Smith*, 2001-2166 (La. App. 1 Cir. 9/27/02); 832 So.2d 307, 311 ("Intent expressed at the appropriate legislative committee meetings is an aid to the courts in determining the true legislative intent and purpose behind the law."); *Bourque v. Bailey*, 93-1657 (La. App. 3 Cir. 9/21/94); 643 So.2d 236, 238 (reviewing transcripts from the legislative hearings leading to the provision's enactment).

In this case, the Court first looks to the statute's plain language. The Moores, in their Motion for Reconsideration, claim that the language unambiguously allows a plaintiff to pocket a damage award for excessive or unreasonable lease operations. They also argue that the legislative history allows them to recover remediation to original condition under Subsection M(1)(c).

### C. Text of the 2014 Amendments

In 2014, the legislature amended the private damage provisions of Act 312. Subsection H now reads:

(1) This Section shall not preclude an owner of land from pursuing a judicial remedy or receiving a judicial award for private claims suffered as a result of environmental damage, except as otherwise provided in this Section. Any award granted in connection with the judgment for additional remediation in excess of the requirements of the plan adopted by the court is not required to be paid into the registry of the court.

(2) Damages that may be awarded in an action under this Section shall be governed by the provisions of Subsection M of this Section. This Section shall not be interpreted to create any cause of action or to impose additional implied obligations under the mineral code or arising out of a mineral lease.

§ (H)(1)(2) (emphasis added).

Subsection M, which defines the damages available under Subsection H, provides:

(1) In an action governed by the provisions of this section, damages may be awarded only for the following:

(a) The cost of funding the feasible plan adopted by the court.

(b) The cost of *additional remediation* **only if required by an express contractual provision providing for remediation to original condition or to some other specific remediation standard.**

(c) The cost of evaluating, correcting or repairing environmental damage upon a showing that such damage was caused by unreasonable or excessive operations based on rules, regulations, lease terms and implied lease obligations arising by operation of law, or standards applicable at the time of the activity complained of, provided that

5

      such damage is not duplicative of damages awarded under Paragraphs (1) and (2) of this section.

  (d)  The cost of nonremediation damages.

§ (M)(1)(a-d) (emphasis added).

### D. The Interplay Between Subsections H and M

Originally, based on the text of the statute, and bolstered by certain canons of interpretation, the Court held that all extra-contractual damages under Act 312 had to be deposited into the Court's registry. The Moores disagree. They argue that a successful plaintiff can pocket the costs necessary to correct environmental damage arising from unreasonable or excessive operations. In support, the Moores cite the statute's plain language, canons of statutory interpretation, and legislative history.

First, the Moores argue the Court's interpretation deviates from the statute's plain language.[1] They point to Subsection H(1) and the plain meaning of "additional." Claiming that damages to correct or repair unreasonable or excessive operations would constitute remediation, the Moores posit that this remediation would be "additional" because it is in excess of that needed to fund the most feasible plan. They further note, "[b]ased on any fair reading of Subsection(1), the phrase 'additional remediation' simply means an award that is in excess of the requirements of the most feasible plan." [Doc. No. 60].

But Subsection H cannot be read in a vacuum. The Moores' argument ignores Subsection M, which defines the damages available under the Act. "Additional remediation" appears in only one of Subsection M's listings, M(1)(b), which purports to award additional remediation "only" if

---

[1] The Moores also argue the Court's interpretation renders certain provisions of the statute superfluous and would result in absurd results. Given the ambiguity in the statute and unambiguous legislative history, the Court need not reach these contentions.

provided in a contractual provision. § (M)(1)(b). That Subsection M(1)(c) did not use the words additional remediation to describe its damages, and that Subsection M(1)(b) purports to limit the cost of "additional remediation" to contracts, could lead a reasonable interpreter to conclude the Legislature intended to limit a plaintiff's direct damages to those compelled by contract.

On the other hand, one could point to Subsection M(1)(d) which is labeled "non-remediation" damages. If Subsection M(1)(d) encompasses all non-remediation damages, then Subsection M(1)(c) would necessarily encompass a type of remediation which would be additional to that awarded pursuant to the most feasible plan. Under that construction, the damages described in Subsection M(1)(c) would be additional remediation by context.

The Court concludes the statute lacks clarity on what damages a successful plaintiff must deposit in the Court's registry. In Louisiana, courts routinely review legislative history to resolve ambiguity and discern the Legislature's intent. Accordingly, the Court will consider the 2014 Amendments' legislative history.

### E. Legislative History of the 2014 Amendments

The Moores rely heavily on comments made by the bill's author, Senator Robert Adley ("Senator Adley"), during an April 9, 2014 hearing before the Senate Natural Resource Committee.[2]

---

[2]Denbury objects to the Court's consideration of this evidence. First, it claims the transcripts of the Senate Natural Resources Committee hearing are unauthenticated. Second, it claims the video footage of the House Civil Law Committee proceedings is incomplete and unauthenticated. The Court finds the objections unpersuasive. The circumstances serve to authenticate the transcripts and videos. Indeed, a party satisfies the authentication requirement if the document's form and content, taken with other circumstances, indicate the document is reliable. FED. R. EVID. 901(b)(4). Nor does the incomplete nature of the evidence justify ignoring it. Denbury claims the tapes are edited, but "make[s] no claim of (or offer[s] any reason to suspect) fraud or tampering, nor do[oes] [it] say that the videos do not show actual footage of the [event] in question." *Asoiciacion De Periodistas De Puerto Rico v. Mueller*, 680 F.3d 70, 79 (1st Cir. 2012) (refusing to exclude videos where opponent failed to provide specific reasons why

During the hearing, Senator Adley and other proponents discussed whether the 2014 Amendments would change the law. Senator Adley repeatedly emphasized that the 2014 Amendments were not meant to change the law in the wake of *State v. La. Land & Explo. Co.*, 2012-0884 (La. 1/30/13); 110 So.3d 1038[3] ("*LL&E*"). Rather, the amendments attempted to codify that decision.

Indeed, in response to concern that the amendments changed the law, Senator Adley reassured that the amendments maintained the status quo:

> Senator Amedee: Does this bill change the substantive law in any way and does it affect, you know, 2683, Civil Code 2683 [stet] dealing with leases?
>
> Senator Adley: I don't think it does.
>
> Senator Adley: What we've done now is we've taken seven years of jurisprudence, because the courts have spoken to this issue in the Supreme Court twice. We've taken that seven years of jurisprudence and we've created what I think is the answer...
>
> Senator Adley: I've heard my name thrown around. I've heard all this thrown around them, and I've heard all this about what we're changing, what I'm trying to change. I'm not changing a flipping thing. These are the words from the two court cases that he said he was so proud of.

---

they were not fair depictions of the events in question).

[3]*LL&E*, discussed at length in the Court's Ruling on Denbury's Motion for Partial Summary Judgment, and rendered before the 2014 amendments, clarified the damages available under Act 312. The case specifically held that Act 312 does not limit a successful plaintiff's remedy to the damages needed to fund the most feasible plan. *See La. Land and Explor.* 110 So.3d at 1054 ("In Subsection H, the [L]egislature specifically makes clear the statute was not intended to change the substantive law. Subsection H states that the procedure enacted by this Section shall not preclude a landowner from pursuing a judicial remedy or receiving a judicial award for private claims, other than those remediation damages necessary to fund the most plan to remediate the land to a standard that protects the public interest...").

[Doc. No. 60-2, Transcript of April 9, 2014 Committee Hearing, p. 25-27].

After the hearing before the Senate Natural Resources Committee, the bill was presented to the House Civil Law Committee for hearing on May 12, 2014. The hearing was captured on video. The Moores point to several video clips to further demonstrate the legislative intent was to capture the state of the law after *LL&E*.

Mr. Jimmy Faircloth ("Faircloth"), a proponent of the amendments gave the following sworn testimony before the committee:

> Item one is the feasible plan, that's the regulatory. Item two is express contractual clean-ups. Item three is a codification of the way that Act 312 works on top of the Mineral Code and Civil Law. There's been tens of millions of dollars spent on what you see number three here. That's where 98% of the litigation in the legacy world has centered around that piece. ..and the Supreme Court in those two opinions essentially said this is what happens...this is what the Supreme Court (in *Marin* and *LL&E*) said. It said implied obligation does exist and it exists along with 312 and along with these other remedial pieces, here's how it exists. And so that's what this is, that...jurisprudential explanation is woven into this statutory language.

[Doc. No. 60-2, Video Clip of May 12, 2014 Committee Hearing].

In a later hearing before the full House for approval on May 15, 2014, Representative Neal Abramson ("Abramson") fielded concern that the bill was changing the law. Abramson assured that the purpose of the amendments was to ensure that the statute's language encompassed a landowner's implied mineral rights under Supreme Court precedent.

> ...There are express contractual rights to a heightened remediation over and above what the state regulatory requirement is. But even if you don't have an express provision in your contract, the Mineral Code and the Civil Code have been interpreted to give you implied rights. That is what's in paragraph 3, not 2...

[Doc. No. 60-2, Video Clip of May 15, 2014 House Hearing].

The legislative history makes a compelling case for interpreting the statute to preserve the *LL&E* holding. The Court also finds that the Moores' interpretation is in line with what the *LL&E*

9

court described as the statute's central purpose: ensuring remediation of damaged property. *See La. Land and Explor.* 110 So.3d at 1049.

Thus, the Court amends its Ruling to clarify that the 2014 Amendments do not overrule *LL&E* with respect to the damages a successful plaintiff can directly recover. Accordingly, should the jury find Denbury acted unreasonably or excessively, the Moores could pocket the resultant damages. And to that extent, the Moores' motion for reconsideration is GRANTED.

However, the Court reaffirms its dismissal of the Moores' claim for a cleanup to original condition. The statute unambiguously precludes that claim here. Remediation to "original condition" or some other specific remediation standard is permitted only through contract. § (M)(1)(b). No such contract exists in this case, and there is no reason to amend the Court's Ruling or Judgment on the issue. Thus, to the extent the Moores move the Court to reconsider dismissing the claim for remediation to original condition, the motion is DENIED.

### III. CONCLUSION

For those reasons, To the extent the Moores seek reconsideration of the Court's finding that damages under LA. REV. STAT. § 30:29 M(1)(c) must be deposited into the Court's registry, the motion is GRANTED. Upon reconsideration, the Court finds that damages awarded under LA. REV. STAT. § 30:29 M(1)(c) need not be deposited into the Court's registry. The motion is otherwise DENIED.

MONROE, LOUISIANA, this 1st day of March, 2016.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE